UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THE DOE RUN RESOURCES CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV01897 AGF |
| | ) | |
| LEXINGTON INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This diversity matter is before the Court on the motion of Plaintiff The Doe Run

Resources Corp. ("Doe Run") for partial summary judgment against Defendant Lexington

Insurance Co. ("Lexington"), and Lexington's three separate motions for full or partial

summary judgment against Doe Run.  Oral argument was held on the motions on

February 27, 2012.  The key question in the case is whether, under commercial general

liability policies it issued to Doe Run from 1998 to 2006, Lexington has a duty to provide

Doe Run with defense coverage in another lawsuit that alleged property damage as a

result of conduct by Doe Run.  For the reasons set forth below, Doe Run's motion for

partial summary judgment shall be denied, and Lexington's motion for summary

judgment based on pollution exclusions in the policies shall be granted.  These rulings

will render moot Lexington's alternative motion for partial summary judgment based on

late notice and Lexington's alternative motion for partial summary judgment with regard

to pre-tender defense costs.

## BACKGROUND

Doe Run is a company that focuses on mining, milling, and smelting lead. Lexington has been its commercial general liability insurer since at least 1995.  In this action, Doe Run seeks a declaration that Lexington must pay Doe Run's defense costs in another lawsuit (*Nadist, LLC v. The Doe Run Res. Corp.*, No. 4:06-cv-00969 (CDP)) ("*Nadist*"), filed on June 23, 2006, in which Doe Run was sued by Nadist, LLC, the holder of property underlying and adjacent to one of Doe Run's lead and zinc mines in Missouri, the Sweetwater Mine and Mill (the "Mine").

The first amended complaint in *Nadist* was filed on February 2, 2008 (Doc. No. 72), and stated that the plaintiff was bringing the lawsuit "to protect the environment and human health around Doe Run's Mine and Mill, and to end the release of toxic contaminants into the soil, air, and water from and at that facility." (¶ 12.)  The allegations included the following with respect to lead:

- Through its mismanagement of the Mine since 1998 when Doe Run acquired it, Doe Run caused hazardous and toxic substances, primarily lead, zinc, and lead tailings but also other substances including arsenic, cadmium, chromium, copper, manganese, nickel, and thallium to contaminate the soil, air, and water around the Mine, including property owned by the plaintiff.  (¶ 2.)

- Such contamination exceeded health and safety thresholds set by the United States Environmental Protection Agency and other regulatory agencies. (¶ 3.)

- High concentrations of lead and other toxic substances were detected at or near the

2

surface with the highest concentrations closest to the Mine and its haul road, suggesting that the contamination emanated from the Mine and haul trucks that carried ore concentrate from the Mine.  (¶ 7.)

- The Mine generated ore concentrate, which contained toxic substances including lead; haul trucks then hauled loads of the ore concentrate from the Mine; ore concentrate was released from the Mine and haul trucks and contaminated the soil, air, and water at or near the Mine.  In many instances, Doe Run then abandoned the released ore concentrate where the contamination occurred.  (¶¶ 25, 26.)

The plaintiff in *Nadist* claimed that by the above conduct, Doe Run violated various environmental laws, including the federal Resource Conservation and Recovery Act ("RCLA"), the federal Clean Water Act, and the federal Clean Air Act.  The plaintiff also asserted state law claims for trespass, nuisance, specific performance of contract, and breach of contract.  The relief sought was an order requiring Doe Run to remedy the damage caused to the site and surroundings, including the property owned by the plaintiff; enjoining further conduct that caused health and environmental threats; imposing penalties; and awarding attorney's fees.

On June 3, 2008, the State of Missouri (the Missouri Department of Natural Resources) moved to intervene as a plaintiff in *Nadist*, submitting a proposed intervenor complaint which basically tracked the allegations and relief sought in the main complaint with respect to property (waterways) owned by the State, and added a claim under Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA").  The motion to intervene was granted on October 17, 2008.

On September 10, 2009, Doe Run wrote to Lexington requesting coverage, under liability insurance policies issued by Lexington, for the defense costs being incurred in *Nadist*.  The letter did not mention the State's involvement in the case.  On November 30, 2009, Lexington denied coverage, citing numerous grounds, including that pollution exclusions in the policies defeated Doe Run's right to the defense coverage it sought. Doe Run filed its complaint in the present action on October 8, 2010, seeking declaratory judgment that Lexington owes it defense coverage in *Nadist* (Count I), and asserting claims for breach of contract and unreasonable refusal to pay (Counts II and III, respectively).  By the time the Court granted the State's motion to intervene in *Nadist*, Doe Run had incurred over $1.7 million in attorney's fees and costs in that case; by September 10, 2009, when Doe Run requested coverage for defense costs, it had incurred approximately $2.7 million in such costs.  On April 13, 2012, *Nadist* settled.

At issue in the present case are eight policies issued by Lexington from 1998 to 2006.  Doe Run asserts that it is seeking coverage separately under these policies, each of which in and of itself obligates Lexington to provide full defense costs for *Nadist*.  By way of general background regarding its operation of the Mine, Doe Run explains that the mining process first removes the ore material from underground.  The ore contains the target metals, typically in small proportions relative to the total volume of ore.  The milling process separates the parts of the ore and produces the commercially valuable metal concentrates, which are either sold as is, or transported to smelters for processing

4

into ingots, bars, or other forms.  Most of the remainder of the milled ore is the "tailings"

(the consistency of sand) or "chat" (the consistency of gravel), depending on the milling

process.  The tailings and chat also are commercially valuable materials and at various

times have been used or sold by mining companies for remilling (to extract additional

metals), agricultural lime, construction material, or other purposes.

**The Policies**

The policies typically state as follows:

> [Lexington] will pay on behalf of the Insured all sums which the
> Insured shall become legally obligated to pay as compensatory damages . . .
> because of:
>
> > bodily injury, or
> > property damage
>
> to which this insurance applies, caused by an an [sic] occurrence which
> takes place within the policy territory, and the Company shall have the right
> and duty to defend any suit against the Insured seeking damages on account
> of such bodily injury or property damage, even if any of the allegations of
> the suit are groundless, false or fraudulent . . . .

The policies define "occurrence" as any "accident, including continuous or

repeated exposure to substantially the same general harmful condition."  With regard to

defense coverage, the policies state, "Defense Costs Payments: In consideration of the

premium charged, it is agreed that any Defense Costs Payments made under this policy

shall not reduce the Limits of Liability otherwise available."  The policies provide

$5,000,000 of coverage per occurrence of property damage, should indemnity coverage

ever be needed.  The policies also include a $500,000 "retention," which Doe Run must

first expend before Lexington would start providing defense or indemnity coverage.

5

The policies in effect between November 1, 1995, and November 1, 2004, include

the following exclusion:

This insurance does not apply:

to bodily injury or property damage (including the loss of use thereof) caused by, contributed to or arising out of the actual or threatened discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, pollutants or contaminants into or upon the land, the atmosphere or any course or body of water, whether above or below ground. It is understood and agreed that the intent and effect of this exclusion is to delete from any and all coverage afforded by this policy any claim, action, judgment, liability, settlement, defense or expenses (including any loss, cost, or expense arising out of any governmental direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants) in any way arising out of such actual or threatened discharge, dispersal, release or escape, whether such results from the Insured's activities or the activities of others, and whether or not such is sudden or gradual, and whether or not such is accidental, intended, foreseeable, expected, fortuitous or inevitable, and wherever such occurs.

The policies in effect between November 1, 2004, and November 1, 2009, contain

a "Total Pollution Exclusion Endorsement," which provided as follows:

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

\*   \*   \*

Exclusion f. - under paragraph 2., Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is replaced by the following:

f. (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge,

6

dispersal, seepage, migration, release or escape of pollutants at any time.

(2) Any loss, cost or expense arising out of any:

> (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

> (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

> Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminate including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

The policies that were issued between 1995 and 2002 provided that, "if claim is made or suit is brought against the Insured, the Insured shall immediately forward to [Lexington] every demand, notice, summons or other process received by his or her representative."  These policies also contained a Self Insured Retention ("SIR") endorsement, which established a $500,000 SIR for each occurrence, and provided that defense costs and claim expenses eroded this amount.  The SIR endorsement in the policies in effect from November 1, 1995, to August 31, 2002, also required Doe Run to immediately notify Lexington of a claim that "(a) involved serious 'Bodily Injury' or fatality; (b) the 'Insured' has received notice of suit in which the damage demand exceeds

the Self Insured Retention; [or] (c) may exceed 25% of the SIR."[1]

The record includes an internal Lexington email dated November 18, 2002, that stated, "Pollution exclusions do not have a history of preventing lead claims."

In 2004, Lexington began to use a new general liability form that for the first time included "a lead exclusion."  As Doe Run's policies had never included such an exclusion, Lexington deleted it from the policies it thereafter issued to Doe Run.  This is reflected in an October 1, 2008 email from Nancy Richard (Lexington's designated underwriter) to Meredith King (Lexington's referral underwriter), which stated:  ". . . Deletion of the lead exclusion -- as this is a lead mine it is hard to exclude lead and still indicate we are providing coverage.  Based on notes from the client due to the inherit [sic] nature of the risk, we cannot exclude the lead. . . ."  King responded: "Approved."  (Doc. No. 82-12.)

The deleted lead exclusion excluded coverage for:

(1)  "Bodily Injury" or "Property Damage", for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever;

(2)  The costs of clean up or removal of lead or products and materials containing lead;

---

[1]    The policy in effect from August 31, 2002, to November 1, 2002, contains the same language, with the exception of requirement (c), which instead reads "may exceed 50% of the Aggregate [SIR]," as defined in the endorsement.

(3)  The costs of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, or lead or products and materials containing lead;

(4)  The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result;

(5)  The cost of compliance with any law or regulation  regarding lead.

## ARGUMENTS OF THE PARTIES

Doe Run argues that it has shown all it needs to show to prevail on its motion for summary judgment on Counts I and II, namely, that the allegations in *Nadist* were sufficiently broad to allege (1) property damage (2) that was caused by an "occurrence" as defined by the policies.   In its opening brief, Doe Run does not mention the pollution exclusions.  Lexington's response and Doe Run's reply address the key issue of the case–whether the pollution exclusions apply here.  These arguments are the same arguments the parties pursue in the context of Lexington's motion for summary judgment based on the pollution exclusions as summarized below.

Lexington argues that it is entitled to summary judgment on all of Doe Run's claims because the plaintiff's allegations in *Nadist* "fall squarely within the terms of the pollution exclusions," and even the broadest reading of the *Nadist* complaint permits no reasonable interpretation other than that the injuries alleged therein arose out of the discharge, dispersal, release, or escape of pollutants or contaminants, bringing the

9

complaint fully within the language of both forms of the pollution exclusion contained in the Lexington policies.

Doe Run counters that Lexington can only deny defense coverage based on the pollution exclusions if it can prove that <u>every</u> allegation in *Nadist* falls within the exclusion; if there are any allegations outside the exclusion, then under the "potential for coverage" standard, Lexington owes a defense. Doe Run asserts that the *Nadist* complaint includes allegations concerning lead, metals, and other substances that are commercially valuable materials to Doe Run. Doe Run further contends that under Missouri law, such commercially valuable materials, unless expressly identified in the policy definition of "pollutant," are not considered "pollutants," and here the policies fail to list lead in the definition of "pollutant." Doe Run also relies on the deletion of the "lead exclusion" in its policies after 2004. Doe Run argues that application of the pollution exclusions to the claims in *Nadist* "would all but render coverage illusory" under the policies.

In reply, Lexington maintains that despite Doe Run's assertion that lead concentrate is a commercially valuable product, lead remains a pollutant within the context of the allegations in *Nadist*. According to Lexington, because the policies at issue do not contain a lead exclusion, they extend coverage with respect to product liability claims involving finished lead and products incorporating finished lead, but the pollution exclusions shield Lexington from the obligation to defend pollution/contamination

claims, such as those in *Nadist*, involving "intermediate materials" such as metal concentrates.

In support of one of its alternative motions for partial summary judgment, Lexington argues that even if it owes Doe Run defense coverage for *Nadist*, this obligation only applies to defense costs incurred by Doe Run after September 10, 2009, when Doe Run requested coverage for defense costs.  In its alternative motion for partial summary judgment based on late notice, Lexington asserts that New York law applies to the policies in effect between November 1, 1995, and November 1, 2002, and under New York law, an insured did not have to show actual prejudice to deny a claim based upon late notice.[2]

Doe Run argues that Missouri law governs all the policies, and that under Missouri law, an insurer cannot deny coverage based on late notice unless the insurer can prove actual prejudice, which here Lexington does not assert.  Doe Run further argues that even if New York law applies to the policies in effect from 1998 to 2002, that does not impact the policies at issue from 2003 onward, which Lexington admits are governed by Missouri law, and since each of those other policies independently provides full defense coverage for *Nadist*, Lexington's alternative motion for partial summary judgment based on late notice is, in effect, moot.

---

[2]  Though the undersigned does not reach the notice issue, the Court notes that New York law changed in July 2008 to require a showing of prejudice for events occurring after that date.  *See Aspen Ins. UK Ltd. V. E. Coast Preservation Co.,* No. 3804/10, 2011 WL 344554, at *7 (N.Y. Sup. June 9, 2011).

In reply, Lexington repeats its choice of law arguments, but does not address the mootness argument, i.e., that in any event, the policies from 2003 to 2006 obligate Lexington to provide defense coverage in *Nadist*.

## DISCUSSION

### Summary Judgment Standard

Summary judgment should be granted when–viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences–the record shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party.  *Heacker v. Safeco Ins. Co. of Am.,* ___ F.3d ___, No. 11-1489, 2012 WL 1289787, at *1 (8th Cir. April 17, 2012).

Federal district courts sitting in diversity apply the law, including choice of law rules, of the state in which they sit, *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991), and are "bound by decisions of the highest state court when interpreting state law." *Beckon, Inc. v. AMCO Ins. Co.*, 616 F.3d 812, 819 (8th Cir. 2010) (citation omitted).  "If the [state supreme court] has not spoken on an issue, the federal court must determine what decision the state court would make if faced with the same facts and issue.  The federal court should consider relevant state court decisions, analogous

12

decisions, considered dicta, ... or [] and any other reliable data." *Myers v. Lutsen Mountains Corp.*, 587 F.3d 891, 896 (8th Cir. 2009) (citation omitted).

Here, the parties basically agree, and the Court concludes, that the question of whether Missouri or New York law applies is only relevant to Lexington's motion for partial summary judgment based on late notice, as under both Missouri law and New York law, the general rules for interpretation of contracts apply to insurance policies and are virtually the same. And so, with respect to questions involving interpretation of the insurance policies, the Court will generally cite just to cases applying Missouri law.[3]

"The 'cardinal rule' for contract interpretation is to 'ascertain the intention of the parties and to give effect to that intention.'" *Secura Ins. v. Horizon Plumbing Inc.*, 670 F.3d 857, 861 (8th Cir. 2012) (quoting *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. 1973)). The parties' intent is presumptively expressed by the "plain and ordinary meaning" of the policy's provisions, which are read "in the context of the policy as a whole." *Id.* (quoting Missouri cases).

"A contract is ambiguous when the terms are susceptible of more than one reasonable meaning. Interpretation of a contract is a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute

---

[3]   Without definitively deciding the issue, the Court believes that Missouri law applies to all the insurance policies at issue. *See Heacker*, 2012 WL 1289787, at *2 (quoting *Sheehan v. Nw. Mut. Life Ins. Co.*, 44 S.W.3d 389, 397 (Mo. Ct. App. 2000) ("In an action between the parties to an insurance contract, the principal location of the insured risk is given greater weight than any other single contact in determining the state of applicable law provided that the risk can be located in a particular state.")).

regarding the intent of the parties." *Shaw Hofstra & Assocs. v. Ladco Dev., Inc.*, 673 F.3d 819 (8th Cir. 2012) (citation omitted). "[T]o determine whether a contract is ambiguous the court must consider the entire written agreement and give words their ordinary and usual meaning." *Id.* (Internal quotations omitted).

"An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Peters* v. *Emp'rs Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. 1993). Insurance policy language is ambiguous when it is reasonably open to different constructions. *Lincoln Cnty. Ambulance Dist. v. Pac. Emp'rs Ins. Co.*, 15 S.W.3d 739, 743 (Mo. Ct. App. 1998). The determination of whether policy language is plain and unambiguous "is made in light of the meaning that would ordinarily be understood by the layman who acquired the policy." *Hocker Oil Co. v. Barker-Phillips-Jackson, Inc.*, 997 S.W.2d 510, 516 (Mo. Ct. App. 1999).

"Exceptions and limitations contained in insurance policies should be construed strictly against the insurer." *Standard Artificial Limb, Inc. v. Allianz Ins. Co.*, 895 S.W.2d 205, 209 (Mo. Ct. App. 1995). "When an insurance company seeks to escape coverage based on a policy exclusion, the burden is on the insurer to establish that the exclusion is applicable." *Hartford Accident & Indem. Co. v. Doe Run Resources Corp.*, No. 4:08-cv-1687 CAS, 2010 WL 1687623, at *2 (E.D. Mo. Apr. 26, 2010) ("*Hartford*"); *Am. Family Mut. Ins. Co. v. Bramlett ex rel. Bramlett*, 31 S.W.3d 1, 4 (Mo. Ct. App. 2000).

"The duty to defend is broader than the duty to indemnify. To extricate itself from a duty to defend the insured, the insurance company must prove that there is no

14

possibility of coverage.  Coverage is principally determined by comparing the language

of the insurance policy with the allegations in the pleadings." *Renco Grp., Inc. v. Certain*

*Underwriters at Lloyd's, London*, ___ S.W.3d___, 2012 WL 925033, at *5 (Mo. Ct. App.

2012) (citations omitted); *see also Incorporated Village of Cedarhurst v. Hanover Ins.*

*Co.,* 675 N.E.2d 822, 824 (N.Y. 1996) ("An insurer's duty to defend must be determined

from the allegations of the complaint.  If the complaint contains any facts or allegations

which bring the claim even potentially within the protection purchased, the insurer is

obligated to defend.") (internal quotations omitted).

      Here, the Court concludes that the language in the insurance policies at issue

plainly and unambiguously excluded pollution claims, and that *Nadist* was an action that

asserted pollution claims.  The allegations in *Nadist* set forth above all fit squarely within

the language of the pollution exclusions in the policies.  At oral argument, counsel for

Doe Run identified paragraphs 25 and 26 of the first amended complaint in *Nadist* as

most clearly presenting allegations that were not covered by the pollution exclusions.  As

noted above, these paragraphs alleged that contamination was caused by lead concentrate

that was released from the Mine and haul trucks, and, in many cases, abandoned by Doe

Run where the contamination occurred.

      According to Doe Run, because lead concentrate is a commercially valuable

product, and because the pollution exclusions did not include the term "lead" in the

definition of "pollutant," the exclusions do not apply to, or at the least are ambiguous

with respect to, the claims in *Nadist* based on lead concentrate.  Doe Run cites to *Hocker*

15

*Oil Co.* in support of its position.  In that case a drain plug on a gasoline storage tank at a gasoline station owned by the plaintiffs failed, releasing approximately 2,000 gallons of gasoline into the ground. The gasoline migrated onto property owned by individuals who sued the plaintiff for personal injuries and property damage.  The plaintiff sued its insurer for defense costs and indemnification pursuant to a "Special Multi-Peril Policy" after the insurer denied the plaintiff's request for coverage, relying on a pollution exclusion in the policy.  Gasoline was not included in the policy definition of "pollutants."  *Id.* at 518. The Missouri Court of Appeals held that this rendered the pollution exclusion ambiguous in the eyes of the plaintiff which was in the business of transporting, selling, and storing gasoline on a daily basis.  "Gasoline is not a pollutant in its eyes.  Gasoline is the product it sells."  Accordingly, the court held that the trial court correctly construed the policy against the insurer and correctly granted the plaintiff summary judgment.

This Court does not find *Hocker Oil Co.* dispositive here.  First, the state appellate court in that case specifically limited its holding to gasoline leaks at gasoline stations. "The cases involving substances other than gasoline are not particularly helpful" as pollution exclusions "can, of course, be ambiguous in one context and not another."  *Id.* at 516 (citations omitted).  Second, the Court believes that contamination caused by a gasoline leak resulting from a failed plug is quite different from contamination resulting from lead concentrate abandoned on a landowner's property.  Third, *Hocker Oil Co.* represents a minority view, *see Whittier Props., Inc. v. Alaska Nat. Ins. Co.*, 185 P.3d 84, 90-91 (Alaska 2008) (stating that the better-reasoned majority approach is that when

16

gasoline escapes or reaches a location where it is no longer a useful product it is fairly considered a pollutant), and this Court does not believe that the Missouri Supreme Court would apply it to the facts of the present case.

Doe Run also relies on *Hartford,* 2010 WL 1687623*,* which involved another insurance company's general liability insurance policies issued to Doe Run, with a pollution exclusion that omitted mention of lead as a pollutant.  The insurer sought a declaration that it had no duty to indemnify Doe Run in connection with several bodily injury and/or property damage lawsuits filed against Doe Run arising out of its operation of a lead smelter near Herculaneum, Missouri.  The court held that genuine issues of material fact precluded summary judgment in the insurer's favor, at least as to some of Doe Run's lead-related activities that were alleged in the underlying lawsuits.  The pollution exclusion in *Hartford* provided as follows:

> It is agreed that the insurance does not apply to personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

*Hartford*, at *3.  This exclusion is narrower than those in the present case, especially the "Total Pollution Exclusion" in Lexington's policies from November 2004 onward. Indeed, the court in *Hartford* relied on the narrowness of the pollution exclusion in that case and specifically distinguished other cases which, like the present case, involved a broader pollution exclusion.  *Id.* at *8.  Furthermore, the allegations in the underlying lawsuits appear to have been much broader than those in *Nadist.*  The Court notes that

17

*Hartford* held that the failure to list lead as a pollutant in the pollution exclusion did not "by itself, . . . automatically render the exclusion ambiguous."  *Id.* at *7.

As noted above, Doe Run also asserts that Lexington's failure to include a separate lead exclusion in its policies bars Lexington from arguing that it has no duty to provide defense coverage for *Nadist*, a case based on lead liability.  The Court concludes that the absence of a lead-specific exclusion does not undermine the pollution exclusions or reverse their effect.  *See Truck Ins. Exch. v. Heman*, 800 S.W.2d 2, 4 (Mo. Ct. App. 1990) (stating that exclusions do not endow coverage, and "there is no reason to find that coverage was created by the fact that an exclusion could have been added to the policy but was not").  "A court may not use its powers to create an ambiguity where none exists even though the construing of such insurance contracts is weighted in favor of the insured."  *Id.*  Nor does Lexington's 2008 correspondence with respect to not including the lead exclusion indicate an intent to cover claims such as these, as the lead exclusion at issue is far broader than the pollution exclusion in this context.

In sum, the Court concludes that Missouri's highest court would hold that Lexington has met its burden to establish that the pollution exclusions at issue, even when strictly construed against Lexington, preclude Doe Run's right to coverage for defense costs it incurred in *Nadist*.  Lexington's motion for  summary judgment based on the pollution exclusions will therefore be granted.

18

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for partial summary judgment is **DENIED**.  (Doc. No. 40)

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment on the basis of the pollution exclusion is **GRANTED**.  (Doc. No. 46)

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgment on the basis of late notice is **DENIED** as moot.  (Doc. No. 49)

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgment on pre-tender defense costs is **DENIED** as moot.  (Doc. No. 52)

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of April, 2012.

19